**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

BRIAN MORRIS                    )
                                )
Plaintiff,                      )
                                )
    v.                          )        C. A. F. No.: 2:23-CV-00143-SCJ
                                )
316 TOWING & ROAD SERVICE,      )        **JURY TRIAL DEMANDED**
INC., and MAKSIM LISOVSKIY      )
                                )
Defendants.                     )

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND TO STAY LITIGATION

## INTRODUCTION

For about one month in the summer of 2021, Plaintiff was a tow truck driver for 316 Towing. At the outset of that brief engagement, Plaintiff signed an Independent Contractor Agreement with 316 Towing, in which he agreed to submit any disputes concerning the terms of the Independent Contractor Agreement to arbitration. In clear conflict of the terms of the Independent Contractor Agreement, Plaintiff seeks to pursue an employee's cause of action against 316 Towing and its owner, Maksim Lisovskiy ("Max"), in court alleging violations of the overtime provisions of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. ("FLSA").

Defendants argue that Plaintiff is required to arbitrate his FLSA claims and that this Court should compel him to do so for the following reasons.

First, the parties entered into an enforceable arbitration agreement. Plaintiff executed an Independent Contractor Agreement (the "IC Agreement") with 316 Towing. Within that IC Agreement is an enforceable arbitration provision which states that "the parties agree that any dispute concerning the terms of [this IC] Agreement will be submitted to mediation followed by binding arbitration. . . ." The arbitration provision is enforceable under the Federal Arbitration Act, 9 U.S.C. § 1, *et seq*. ("FAA"). Plaintiff is not exempted from the FAA as an interstate transportation worker as he is not a part of a class of workers who are actually engaged in the transportation of goods in interstate commerce. Alternatively, the arbitration provision is enforceable under the Georgia Arbitration Code, O.C.G.A. § 9-9-1, *et seq*.

Second, the Plaintiff's FLSA claims are within the scope of the IC Agreement given that the broad language of the arbitration provision encompasses Plaintiff's FLSA employee overtime claims when properly construed in conjunction with the IC Agreement's clear independent contractor provision.

Lastly, Max is permitted to argue equitable estoppel to also benefit from the arbitration provision because Plaintiff's claims against both Defendants are based

on the exact same intertwined facts and allegations and are inherently inseparable. Accordingly, and for the reasons further detailed below, Defendants respectfully request this Court to compel arbitration against the Defendants and stay this action pending completion of the arbitration and further motion of the parties to lift the stay.

## **FACTUAL BACKGROUND**

316 Towing & Road Service, Inc. is a towing business with one office located in Winder, Georgia.[1] 316 Towing provides roadside assistance to customers within and around Winder, Georgia, including towing, winching, accident response, jump starting vehicles and other related services.[2] As part of its business, 316 Towing engages tow truck drivers as independent contractors.[3] Each of 316 Towing's tow truck drivers have used a timekeeping software program called "Towbook," which tracks data including calls from dispatch, rejected calls, precise GPS driving time, and time spent servicing customers.[4]

Each 316 tow truck driver was required to sign an Independent Contractor Agreement before performing work for 316 Towing.[5] On or around May of 2021,

---

[1] Affidavit of Elisha "Eli" Kudrin attached hereto as Exhibit "1" at ¶ 3.
[2] Ex. 1 ¶ 4.
[3] Ex. 1 ¶ 5.
[4] Ex. 1 ¶ 6.
[5] Ex. 1 ¶ 7.

Plaintiff executed an Independent Contractor Agreement with 316 Towing.[6] The

Independent Contractor Agreement includes the following provisions relevant to

Plaintiff's FLSA claims, and this Motion, which in pertinent part state:

> WHEREAS, the parties desire to enter into an independent contractor relationship . . . .[7]
>
> ***
>
> **D.    Independent Contractor Status.** It is the intent of the parties for Contractor to retain the status of an independent contractor in business for federal and state law purposes. Carrier's control over Contractor shall be limited to that control required by federal and state statutes and regulations governing the conduct of motor carriers. Contractor shall train all of its driver personnel in accordance with U.S. DOT requirements and shall submit all driver personnel to Carrier for qualification, safety and training to the extent required by federal regulations. . . . Contractor shall have the right to substitute other qualified drivers to perform the services subject to Carrier's confirmation that Contractor's driver meets the driver qualifications established by the U.S. DOT and its insurers. . . .[8]
>
> ***
>
> **6.    Integrated Claim.**  The Parties agree that this cont[r]act sets forth the full understanding of the Parties. . . .[9]
>
> ***
>
> **9.    Alternative Dispute Resolution**. The parties agree that any dispute concerning the terms of this Agreement will be submitted to mediation followed by binding arbitration before a tribunal convened under the rules of the American Arbitration Association at Atlanta, GA.[10]
>
> ***

---

[6] Ex. 1 ¶ 10.
[7] Exhibit "A" to Ex. 1, at 1.
[8] Ex. A to Ex. 1, at 7, § 2(D).
[9] Ex. A to Ex. 1, at 9, § 6.
[10] Ex. A to Ex. 1, at 10, § 9.

4

**10.    <u>Venue and Jurisdiction</u>**. This agreement is made pursuant to the requirements of federal law and otherwise subject to the law of the State of Georgia. The parties agree that any lawsuit shall be filed in a court of competent jurisdiction in Gwinnett County.[11]

On July 27, 2023, Plaintiff filed the instant action alleging he was an employee of 316 Towing and therefore is allegedly entitled to assert causes of action under the FLSA.[12]   Plaintiff alleges his FLSA claims against both 316 Towing and Max as joint employers in stating that "Defendants misclassified Plaintiff as exempt from the requirements of FLSA" and that "[b]y reason of the unlawful acts alleged [in the complaint], Defendants are liable to Plaintiff. . . ."[13]  Plaintiff's claims do not hinge upon the nature of the service that Plaintiff supplied to 316 Towing, but rather Plaintiff's relationship to 316 Towing as an independent contractor.  Defendants now move to compel arbitration of Plaintiff's action.

## <u>LEGAL ARGUMENT</u>

The court must apply the 2-prong analysis found in <u>Lambert v. Austin Ind.</u>, 544 F.3d 1192 (11th Cir. 2008) to rule upon Defendants' motion to compel arbitration. There, the 11th Circuit held that a court must determine whether: (1) an enforceable agreement to arbitrate exists under state law, and (2) the dispute falls

---

[11] Ex. A to Ex. 1, at 10, § 10.

[12] *See* Compl.

[13] Compl. ¶¶ 54, 56.

within the scope of the agreement. *Id*.  Here, both prongs are clearly satisfied and thus the court must compel arbitration and stay the litigation pending the arbitrator's decision.

## I.     AN ENFORCEABLE AGREEMNT TO ARBITRATE EXISTS UNDER STATE LAW BETWEEN PLAINTIFF AND 316 TOWING.

To determine whether a binding agreement to arbitrate was entered into between the parties, courts apply generally accepted "state-law principles that govern the formation of contracts." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). And under Georgia contract law, "[a] definite offer and complete acceptance, for consideration, creates a binding contract." Moreno v. Strickland, 255 Ga. App. 850 (2002). "To satisfy the consideration requirement under Georgia law, an accepting party to a contract can either tender bargained-for performance or make a mutual promise." Lambert, 544 at 1195.

### a.     316 Towing and Plaintiff Formed a Single Binding Agreement to Govern Plaintiff's Services Supplied to 316 Towing.

Here, each element exists to find that the Plaintiff and 316 Towing entered into a binding agreement to arbitrate. First, 316 Towing required, among other items, Plaintiff to sign  an IC Agreement as a part of its decision to contract with Plaintiff for the performance of his services provided to 316 Towing.[14]  Plaintiff undisputedly

---

[14] Ex. 1 ¶ 9.

signed the IC Agreement.[15] Nowhere in Plaintiff's complaint does he allege that he did not sign the IC Agreement.[16] Thus, by signing the IC Agreement Plaintiff accepted 316 Towing's offer to engage Plaintiff's services pursuant to the terms of the IC Agreement in exchange for valuable consideration, including payment of services for worked performed by Plaintiff,[17] in addition to the parties' exchange of mutual promises set forth within the IC Agreement. *See* McBride v. GameStop, Inc., No. 2011 WL 578821 (N.D. Ga. Feb. 8, 2011) (stating that "[t]here are few rules of law more fundamental than that which requires a party to read what he signs and to be bound thereby"). Further, Georgia law recognizes reciprocal promises to arbitrate and be bound by arbitration to constitute sufficient consideration to support a contract. *See* Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359 (11th Cir. 2005)

Even if Plaintiff contends that he did not sign the IC Agreement, Georgia law has long recognized that acceptance and assent to the terms of the Agreement does not even require a signature. *See* Cochran v. Eason, 227 Ga. 316, 318 (1971). Indeed, acceptance can be inferred from a performance under the contract, in part or in full, which then the party having performed is bound. *See* Burson v. Milton Hall Surgical Assocs., LLC, 343 Ga. App. 159 (2017). Here, 316 Towing presented the

---

[15] Ex. 1 ¶¶ 10, 13.
[16] *See* Compl.
[17] Ex. A to Ex. 1, at 4, § 1(K).

7

singular fully integrated agreement governing Plaintiff's services prior to Plaintiff's performance of services and Plaintiff thereafter performed those services without any objection to the Independent Contractor Agreement whatsoever.[18]

Accordingly, 316 Towing offered to engage Plaintiff as an independent contractor driver pursuant to the terms of the IC Agreement in exchange for Plaintiff's mutual promises found therein, including without limitation payment and the agreement to arbitrate disputes. Plaintiff either undisputedly signed the IC Agreement or thereafter performed without objection to the terms of the IC Agreement thereby forming an enforceable agreement under Georgia law.

### b.    A Valid and Enforceable Arbitration Provision Exists Within the Parties' Agreement.

### i.    The Arbitration Provision is Enforceable under the FAA.

The FAA provides for enforcement of arbitration provisions in "any contract evidencing a transaction involving commerce." 9 U.S.C. § 2. Such provisions "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id*. The FAA creates a strong public policy and presumption in favor of the enforcement of an agreement to arbitrate, and as such, puts the burden of proving that a claim is not suitable for arbitration upon the

---

[18] Ex. 1 ¶ 14.

party resisting arbitration. *See* <u>Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 213 (1985).

Additionally, the parties' arbitration provision is not exempted by the carveout found within Section 1 of the FAA for: "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. The Supreme Court has held that this carveout should be narrowly construed. *See* <u>Circuit City</u>, 532 U.S. 105. The 11th Circuit has developed the controlling test for "transportation worker" under Section 1 of the FAA. First, the worker "seeking application of [section one]'s exemption must be in a class of workers "employed in the transportation industry." <u>Hill v. Rent-A-Center, Inc.</u>, 398 F.3d 1286 (11th Cir. 2005). Second, the class of workers must "actually engage in the transportation of goods in interstate commerce." *Id*. at 1290. Here, Plaintiff fails to meet the second prong of the controlling test for the carveout found within Section 1 of the FAA.

Here the IC Agreement plainly "involve[es] commerce" within the broader meaning employed by Section 2 of the FAA.[19] Notwithstanding Defendants'

---

[19] Section 2's coverage of contracts that evidence a transaction "involving commerce" reaches to the fullest extent of Congress's power to regulate interstate commerce, whereas the Section 1 exemption for an "other class of workers engaged in … interstate commerce" is "afforded a narrow construction" and "a more limited reach." <u>Circuit City Stores, Inc. v. Adams,</u> 532 U.S. 105, 117-18 (2001).

interstate operations as a motor carrier, Plaintiff is not carved out from the application of the FAA because he was not a part of a class of workers actually engaged in the transportation of goods in interstate commerce.  Indeed, Plaintiff performed only intrastate trips.[20] Further, the 11th Court has held that drivers performing intrastate trips do not fall within the transportation worker exemption even when the items transported had been previously transported interstate. *See* Hamrick v. Partsfleet, LLC, 1 F.4th 1337 (11th Cir. 2021). In light of the foregoing, Plaintiff is clearly and undisputedly not a part of a class of transportation workers engaged in interstate commerce within the meaning of Section 1 of the FAA. Thus, the parties' arbitration provision is therefore enforceable under the FAA.

ii.     Alternatively, the Arbitration Provision is Enforceable Under Georgia law.

As an alternative to enforcement under the FAA, the Plaintiff's arbitration agreement is also enforceable under Georgia Law. *See* Oliveira v. New Prime, Inc., 857 F.3d 7 (1st Cir. 2017), *aff'd*, 139 S. Ct. 532 (2019) (whether Section 1 carveout applies has "no impact on other avenues (such as state law) by which a party may compel arbitration.").  Here, Plaintiff performed his independent contractor services solely within the state of Georgia.[21] Moreover, there is a choice-of-law provision

---

[20] Ex. 1 ¶ 17.
[21] Ex. 1 ¶ 17.

within the IC agreement which stipulates that the IC Agreement is made pursuant to the requirements of federal law but otherwise subject to Georgia law.[22] Thus, Georgia law governs the enforceability of the arbitration provision to the extent the court rules that IC Agreement does not meet the federal requirements to compel arbitration under the FAA.

Georgia law, like federal law, has a strong public policy in favor of enforcing arbitration agreements. *See* Helms v. Franklin Builders, Inc., 305 Ga. App. 863 (2010) (by enacting the GAC, the Georgia General Assembly has established a clear public policy in favor of arbitration). The Georgia Arbitration Code provides for enforcement of arbitration provisions in "all disputes in which the parties thereto have agreed in writing to arbitrate." O.C.G.A § 9-9-2(c). Given that the agreement in question is not an employment contract, but rather one governing Plaintiff's services as an independent contractor, the requirement in O.C.G.A § 9-9-2(c)(9), that the arbitration clause be initialed by all signatories, does not apply. *See* Joja Partners, LLC v. Abrams Properties, Inc., 262 Ga. App. 209 (2003) (court held O.C.G.A. section 9-9-2(c)(9) was not applicable to independent contractor's agreements, and the arbitration provision did not require the initials of the parties for consent to arbitration as an employment contract would). Similar to the FAA, under Georgia

---

[22] Ex. A to Ex. 1, at 10, § 10.

11

law, once a court has found a valid arbitration agreement exists, the court shall compel the parties to arbitrate. O.C.G.A § 9-9-6.

Here, the IC Agreement, a valid agreement containing a valid arbitration provision, is enforceable under either the FAA or Georgia law. Simply stated, there exists a valid and enforceable agreement to arbitrate between the parties satisfying the first prong of the test set forth by the 11th Circuit in <u>Lambert</u>.

## II.   PLAINTIFF'S FLSA CLAIMS FALL WITHIN THE SCOPE OF THE AGREEMENT.

For purposes of the second prong set forth within <u>Lambert</u>, the Plaintiff's FLSA claim clearly falls within the scope of the arbitration provision and is therefore subject to binding arbitration. The test to determine whether a claim falls within the scope of an arbitration provision is to determine if the factual allegations "touch matters" governed by the parties' agreement. *See* <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,</u> 473 U.S. 614 (1985). [23] When determining the scope of an arbitration provision, courts must give "due regard […] to the federal policy favoring arbitration and [resolve] ambiguities as to the scope of the arbitration clause itself in

---

[23] As a threshold matter, the parties' delegated arbitrability questions to an arbitrator by incorporating by reference the American Arbitration Association (AAA) rules within their arbitration provision. As such this court is not required to review this analysis and can simply compel arbitration after finding that a binding contract exists. *See* <u>JPay, Inc. v. Kobel</u>, 904 F.3d 923 (11th Cir. 2018).

favor of arbitration." <u>Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.</u>, 489 U.S. 468, 489 (1989). The arbitration provision is allowed to be broad and need not spell out each and every cause of action that could arise out of the parties' relationship. *See* <u>Paladino v. Avnet Computer Technologies, Inc.</u>, 134 F.3d 1054 (11th Cir. 1998). Moreover, where an arbitration clause is broad, the presumption in favor of arbitrability applies with even greater force. *See* <u>AT&T Techs., Inc. v. Commc'ns Workers of Am.</u>, 475 U.S. 643 (1986).

The 11th Circuit has found that FLSA claims are indeed capable of being subject to arbitration. *See* <u>Picard v. Credit Solutions, Inc</u>., 564 F.3d 1249 (11th Cir. 2009) (holding that statutory claims are subject to arbitration unless Congress precludes waiver of judicial remedies). In <u>Caley</u>, 428 F.3d 1359, the 11th Circuit affirmed a district court's decision to compel arbitration and dismiss a group of employees' class claims brought pursuant to the FLSA. The arbitration provision in <u>Caley</u> spoke to "Covered Claims" and specifically listed wage related disputes. Here, the parties' arbitration provision contains broad language and encompasses "any dispute concerning the terms of [the] Agreement," which clearly embraces the specific independent contractor provisions found therein.[24] Indeed, implicit within

---

[24] Ex. A to Ex. 1, at 010, § 9.

Plaintiff's action here is the contention that Plaintiff *was not* acting as an independent contractor in contravention of the plain text of the IC Agreement.

While Defendant's arbitration provision here does not speak in the "Covered Claims" language found in <u>Caley</u>, this Court, including numerous other courts, has repeatedly compelled arbitration of FLSA claims where the parties' arbitration provision was broad like the one 316 Towing and Plaintiff entered into here. *See* <u>Carter v. Doll House II, Inc.</u>, 69 F.Supp.3d 1351 (N.D.Ga. 2014), *aff'd in part, vacated in part on other grounds*, 608 Fed. Appx. 903 (11th Cir. 2015) (holding that misclassification claims that arose under an independent contractor agreement were arbitrable where the provision stated that "any dispute regarding this contract/agreement shall be submitted to arbitration[.]"); *see also* <u>Webb v. DoorDash, Inc.</u>, 451 F. Supp. 3d 1360 (N.D. Ga. 2020) (where arbitration clause was broad, encompassing "any and all claims arising out of or relating to this agreement" the court found that plaintiffs' claims that they were not paid tips was a dispute that fell within the arbitration provision.).

Moreover, the Supreme Court has a long-standing presumption of arbitrability in the sense that "[a]n order to arbitrate a particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute. [Where] doubts

should be resolved in favor of coverage." <u>AT & T Techs., Inc. v. Commc'ns Workers of Am.,</u> 475 U.S. 643, 645 (1986). In <u>AT&T Techs</u> the court found the plaintiffs' lay-off disputes fell within the arbitration that stated that "differences arising with respect to the interpretation of this contract, or the performance of any obligation hereunder, must be referred to a mutually agreeable arbitrator upon the written demand of either party." *Id.* The court found that the "presumption is particularly applicable where the clause is broad one [and] in the absence of any express provision excluding a particular grievance from arbitration . . . only the most forceful evidence of a purpose to exclude the claim from arbitration will prevail." *Id*. at 650.

The Parties' broad arbitration provision here reflects the parties' clear intent for arbitration to serve as the sole forum for any dispute concerning the terms of the IC Agreement—including whether Plaintiff was acting as an independent contractor not entitled to the protections afforded under the FLSA. In arguing that the Defendants unlawfully failed to pay him overtime wages, Plaintiff unmistakably challenges the clear terms of the IC Agreement.  Thus, Plaintiff's FLSA claims fall within the scope of the IC Agreement and are subject to arbitration.

Accordingly, Plaintiff's FLSA claim falls within the scope of the IC Agreement, and even if any doubts exist, those doubts should be resolved in favor of arbitration absent "forceful evidence" to the contrary which simply does not exist

here.

## III.  EQUITABLE ESTOPPEL APPLIES TO PERMIT MAKSIM LISOVSKIY TO ALSO BENFIT FROM THE ARBITRATION PROVISION.

Equitable estoppel supplies an exception to the general rule that an arbitration provision is only enforceable against signatories to the agreement. In <u>Bailey v. Vulcan Materials Co.</u>, 2021 WL 5860743 (N.D. Ga. Nov. 16, 2021), the court analyzed 11th Circuit precedence that established that claims against two defendants that are "based on the same facts and are inherently inseparable" justify the application of equitable estoppel. <u>Bailey</u>, 2021 WL 5860743, at *6 (quoting <u>MS Dealer Serv. Corp. v. Franklin</u>, 177 F.3d 942, 948 (11th Cir. 1999), *abrogated in part on other grounds by* <u>Arthur Andersen LLP v. Carlisle</u>, 556 U.S. 624 (2009) (concluding that state law controls whether an arbitration clause is enforceable against a non-signatory under the FAA)).

More specifically in <u>MS Dealer Services Corp.</u>, the 11th Circuit found the application of equitable estoppel justified because the non-signatory and the signatory worked "hand-in-hand," thereby making the plaintiff's claims against the non-signatory intimately intertwined with the obligation imposed by the underlying agreement which the signatory signed. *Id*. Moreover, in FLSA actions against a signatory and a non-signatory, where a plaintiff asserts identical legal claims and

allegations against the non-signatory, courts have found that the subject matter of the dispute is so factually intertwined permitting a non-signatory to enforce an arbitration provision under the doctrine of equitable estoppel. *See* <u>Diaz v. Michigan Logistics Inc.</u>, 167 F. Supp. 3d 375 (E.D.N.Y. 2016) (granting motion to compel arbitration of FLSA claims by drivers against signatory and non-signatory defendants).

Here, Plaintiff alleges Max and 316 Towing to be joint employers and thus application of equitable estoppel is clearly proper. Indeed, Plaintiff alleges and casts its legal claims and factual allegations against Max and 316 Towing collectively as "Defendants", and alleges they each constitute an employer as defined under the FLSA.[25] Additionally, Plaintiff claims that "'Defendants' misclassified Plaintiff as exempt from the requirements of FLSA" and that "[b]y reason of the unlawful acts alleged [in the complaint], Defendants are liable to Plaintiff...."[26] Plaintiff's claims are directed to Max and 316 Towing as joint employers and as such the dispute Plaintiff has against 316 Towing is clearly and inextricably intertwined with his dispute against Max. Accordingly, Max is entitled to enforce the arbitration provision for Plaintiff's claims against him under the doctrine of equitable estoppel.

---

[25]   Compl. ¶ 15.
[26]   Compl. ¶¶ 54, 56.

## IV.    THIS ACTION SHOULD BE STAYED PENDING ARBITRATION.

Both the FAA and Georgia law call for this court to stay this action pending the outcome of the arbitration. *See* 9 U.S.C. § 3; *see also* O.C.G.A § 9-9-6(a).  Thus, at the same time as ordering this matter to arbitration, the Court should stay this action pending the result of the arbitration of Plaintiff's claims.  This stay should apply equally to the action against Max should the Court find that he is not entitled to arbitration of the joint employer FLSA claims alleged against him.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that this Court grant Defendants' Motion to Compel Arbitration and Stay Litigation. First, the parties entered into an enforceable arbitration agreement. The arbitration provision is enforceable under the FAA and Plaintiff is not otherwise exempted by Section 1's interstate transportation worker carveout. Alternatively, the arbitration provision found within the IC Agreement is enforceable under Georgia state law. Second, the Plaintiff's FLSA claims are within the scope of the IC Agreement given the arbitration provisions broad language encompasses FLSA claims when properly construed in conjunction with the IC Agreement's independent contractor provision. Further, equitable estoppel affords Max a basis to also benefit from the arbitration provision given Plaintiff's claims against Defendants are based on the same facts

18

and are inherently inseparable. Finally, the Court should stay this action against both

Defendants pending the outcome of the arbitration and further motion of the parties

to lift the stay.

Respectfully submitted this 6th day of November 2023.


MITCHELL - HANDSCHUH                    /s/Jeremy R. Handschuh
LAW GROUP                               Jeremy R. Handschuh, Esq.
3390 Peachtree Road, NE, Suite 520      Georgia Bar No. 418099
Atlanta, Georgia 30326                  Amanda I. Elliott, Esq.
T: (404) 262 - 9488                     Georgia Bar No. 137633
F: (404) 231 - 3774                     *Counsel for Defendants*
E: jeremy@m-hlawgroup.com
E: amanda@m-hlawgroup.com


*Counsel for Defendants certify that this document complies with N.D.Ga. L.R. 5.1B*
*and the N.D.Ga. Standing Order No. 04-01.*

19

# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### GAINESVILLE DIVISION

BRIAN MORRIS,                )
                            )
Plaintiff,                   )
                            )
     v.                      )          C.A.F.No.: 2:23-CV-00143-SCJ
                            )
316 TOWING & ROAD SERVICE,   )          **JURY TRIAL DEMANDED**
INC., and MAKSIM LISOVSKIY   )
                            )
Defendants.                  )

## AFFIDAVIT OF ELISHA KUDRIN

Elisha Kudrin, having PERSONALLY APPEARED before an officer duly

authorized by law to administer oaths, and having been duly sworn, states the

following:

1.     My name is Elisha ("Eli") Kudrin.  I am over 21 years of age, suffer from no

       legal disabilities, and give this affidavit from personal knowledge for

       utilization for all purposes in the above-styled civil action.

2.     Since about June of 2019, I have been the General Manager of 316 Towing

       and Road Services, Inc. ("316 Towing"). In this role, I am responsible for

       overseeing and managing the day-to-day operations of 316 Towing, including

       direct communications with the drivers engaged by 316 Towing and

maintaining documents related to the drivers. I am personally familiar with 316 Towing's operations and practices.

3.      316 Towing has one office, which is located in Barrow County, Georgia, at 796 Bill Rutledge Road, Winder, GA 30680.

4.      316 Towing provides both intrastate and interstate roadside assistance to customers within and around Winder, Georgia, including towing, winching, accident response, jump starting vehicles, and other related services.

## 316 TOWING

5.      As part of its business, 316 Towing engages tow truck drivers as independent contractors.

6.      Each of 316 Towing's tow truck drivers have used a timekeeping software program called "Towbook," which tracks data including calls from dispatch, rejected calls, precise GPS driving time, and time spent servicing customers.

7.      Each tow truck driver has been required to sign an Independent Contractor Agreement before performing work for 316 Towing.

## BRIAN MORRIS

8.      In or around May of 2021, Brian Morris ("Morris") approached 316 Towing looking for work as a tow truck driver.

9.  316 Towing required Morris sign an Independent Contractor Agreement as a part of its decision to contract with Morris for the performance of Plaintiff's services provided to 316 Towing.

10. On or about May 21, 2021, Morris completed and returned a signed Independent Contractor Agreement, and I then signed on behalf of 316 Towing. A true and correct copy of the Independent Contractor Agreement is attached hereto as "Exhibit A."

11. I am the custodian of records for 316 Trucking, the records within "Exhibit A" were made at or near the time of the matters and occurrences reflected in these records by people with knowledge of those matters, it is the regular practice of the business activity to make the records, and such records are kept in the course of regularly conducted business activity.

12. The Independent Contractor Agreement sets forth (i) Plaintiff's provision of services to 316 Towing as an independent contractor and (ii) a provision that "any dispute concerning the terms of this Agreement will be submitted to mediation followed by binding arbitration before a tribunal convened under the rules of the American Arbitration Association at Atlanta, GA." (Ex. A, pp. 7-8 at § 2.D.; s, p. 10 at § 9)

13. To the best of my recollection, I personally witnessed Brian Morris sign the Independent Contractor Agreement, attached hereto as "Exhibit A," in my

presence, though this was not required so long as each tow truck driver returned a signed Independent Contractor Agreement before performing any work.

14. 316 Towing presented the Independent Contractor Agreement to Morris as the sole agreement governing Morris' services, which Morris reviewed and executed prior to performing of any of his services for 316 Towing, and Morris thereafter performed his services without any objection to the Independent Contractor Agreement whatsoever.

15. Morris provided his services for 316 Towing from about May 21, 2021 through June 19, 2021.

16. In June of 2021, Morris voluntarily stopped performing work for 316 Towing.

17. Morris performed only intrastate trips during his time as an Independent Contractor for 316 Towing. Morris performed his independent contractor services solely within the state of Georgia.

18. None of the tow truck services Morris performed constituted a portion of an interstate leg of transportation.

FURTHER AFFIANT SAYETH NOT.

Respectfully submitted as of the notarized date below. I certify that under

penalty of perjury the foregoing is true and correct.

Affiant
Elisha Kudrin
Operations Manager
316 Towing & Road Service, Inc.

SWORN TO and subscribed before me
by Elisha Kudrin, who is well known to
me or had produced a valid driver's
license as identification, this _6th_ day
of November 2023.

Notary Public
My Commission Expires: 3|30|2025

5

<u>Exhibit A</u>

## INDEPENDENT CONTRACTOR AND LEASE AGREEMENT

This Independent Contractor Agreement is made between 316 Towing and Road Service (hereinafter referred to as "Carrier") and
_Brian Morris_____, (hereinafter referred to as "Contractor").

WHEREAS, Carrier is a for-hire motor carrier operating in interstate commerce and subject to the rules and regulations of the Federal Motor Carrier Safety Administration, the U.S. Department of Transportation, and other federal and state agencies; and

WHEREAS, Contractor is a (check where applicable):  (1) A Sole Proprietorship ☐; (2) Limited Liability Corporation or Partnership ☐; or (3) A Corporation ☐ which owns or leases the equipment identified in Appendix A attached hereto; and

WHEREAS, the parties desire to enter an independent contractor relationship and lease agreement in accordance with applicable law;

NOW, THEREFORE, the parties agree as follows:

This Agreement shall govern the lease of equipment identified on Appendix A with driver by Contractor to Carrier for the continuing performance of a series of separate transportation contracts, the payment for which shall be determined in accordance with the agreed compensation set forth in Appendix B.

1.   Compliance with Federal Statutes and Regulations.  The parties acknowledge and agree that this contract is governed by Federal Regulation, to wit: 49 C.F.R. 376 and it is the intent of the parties that this Agreement fully comply with such regulations without creating indicia of control which would otherwise frustrate the intent of the parties to create an independent contractor relationship.  See 49 C.F.R. 376.12(c)(4).

Accordingly, the parties agree as follows:

A.   Carrier shall exercise that level of dominion and control over the leased equipment required by Federal Motor Carrier Safety Regulations including the execution of an original and 2 copies of this Lease by the parties with a copy or notice of this Lease to be kept on the equipment during its term in accordance with 49 C.F.R. 376.11(a) and 49 C.F.R. 376.12(l).

B.   Receipts specifying the identity of the equipment and stating the date and time possession is transferred shall be issued in the form set forth in Appendix C in the time and manner as required by 49 C.F.R. 376.11(b).

C.   During the period of the Lease, Carrier shall identify the equipment in accordance with FMCSA requirements found at 49 C.F.R. 390.21 and Contractor warrants that it will immediately execute a receipt for return of the equipment as provided for in Appendix C, and remove or submit for removal all identification that the equipment is operated subject to the safety duties and obligations of Carrier. Within five calendar days of termination of the lease,

Initial Here: BM

**Exhibit A., p. 001**

Contractor shall return to Carrier by mail or in person all identification devices, other than those painted directly on the equipment, as well as the executed receipt. Carrier may withhold final payment to Contractor, pursuant to 49 C.F.R. 376.12(f) until this requirement is complied with.

D.    Records of Equipment. Carrier shall keep records covering each separate job or trip for which Contractor's services are retained in accordance with 376.11(d). Contractor warrants that it will instruct its driver to issue, obtain and carry while in transit bills of lading covering each trip which identify the lading and indicating the point of origin, the time and date of departure, the point of final destination, and confirm that the transportation is provided under the responsibility of Carrier.

E.    Contractor warrants that it is the title holder or has equitable ownership of the leased equipment in accordance with 49 C.F.R. 376.12(a).

F.    The Lease shall commence with the time of the giving of the receipt for possession and shall continue from month to month until terminated by either party in accordance with the termination provisions herein.

G.    To fulfill the exclusive possession and responsibilities of the regulations, the authorized Carrier shall have exclusive possession, control and use of the equipment for the duration of the lease and the concomitant safety duties imposed by the Federal Motor Carrier Safety Administration's regulations. See 49 C.F.R. 376.12(c) and the safety regulations found at 49 C.F.R. 390-399.

H.    Contractor recognizes Carrier's regulatory duty to *inter alia* maintain driver qualification files, monitor driver's hours of service, conduct pre-employment and random drug and alcohol screening, verify equipment maintenance and repair, ensure proper securement, transport of freight in accordance with reasonable dispatch and highway restrictions governing the transportation of hazardous and overweight and over-dimensional loads. Contractor certifies that it is familiar with these regulatory requirements, will so instruct its driver personnel in proper compliance and will indemnify and hold Carrier harmless from any breach by it or its employees of this duty or failure to offer reasonable cooperation.

I.    Calculation of Compensation. Compensation set forth in Appendix B is based upon a percentage of the line haul revenue derived from each load or trip tendered by Carrier to Contractor and accepted for transport. Line haul revenue shall be that amount reflected upon the rated freight submitted by Carrier to its customer for payment for the services rendered by Contractor and accordingly shall exclude charges paid to interline carriers, pickup and delivery fees for services not performed by Contractor, expenses for over-dimensional permits, escort service and accessorial charges not earned by line haul equipment or its drivers such as lumpers or rigging expenses. Other expenses not attributable to the services rendered by Contractor shall also be excluded from line haul revenue. In accordance with 49 C.F.R. 376.12(g), Carrier will give Contractor before or at the time of settlement a copy of the rated freight bill or computer-generated document containing the same information. Upon request, Contractor may view other documents as required by regulation. In addition to the agreed

Initial Here: BM

percentage of line haul revenue, Contractor shall receive 100% of any fuel surcharge, if any, collectible by Carrier as reflected on its rated freight bill.

       J.   <u>Non-Reimbursable Expenses</u>. For the consideration specified above, Contractor agrees to be solely responsible for the following additional expenses:

      (1)   Identification Devices. (At its expense upon termination of lease, Contractor removing identification devices, offering suitable evidence to Carrier that such devices have been removed, or submit the equipment to Carrier for its removal.)

      (2)   Cost of Fuel.

      (3)   Fuel Taxes.

      (4)   Permits of all types.

      (5)   Tolls, ferries, accessorial services, base plate and licenses.

      (6)   The hiring and settling of wages for its drivers and the payment of all employment taxes, worker's compensation insurance,

      (7)   The maintenance of all equipment in accordance with DOT standards.

      (8)   The payment of all operating expenses including Federal Highway Use Taxes, personal property taxes, fines incurred by it.

      (9)   Furnishing all tools, including tie-downs and load securement equipment, and safety equipment required by the DOT and/or FMCSA.

      (10)   Cost pertaining to the proper training and instruction of Contractor and its employees.

      (11)   Compatible on-board computer and tracing technology to meet Shipper's requirements. Attached hereto as Appendix D is a list of tools and other devices which Contractor is required to provide pursuant to this Agreement which can be purchased or rented to Contractor by Carrier for the fees stated therein. If Contractor elects to purchase or rent these items by executing the addendum in the place provided, the cost of same will be charged back to settlements until such time as the tool or device is returned in good condition, ordinary wear and tear excepted.

Initial Here: BM

(12)   <u>Property Damage to Carrier's Trailer</u>.  Contractor shall be responsible for any property damage to Carrier's trailer equipment or other equipment beyond ordinary wear and tear.

(13)   <u>Fines for Oversize or Overweight Shipments</u>.  Unless trailers are preloaded and sealed or containerized, Contractor or its employees shall be responsible for confirming that all lading is suitable for transportation in accordance with applicable weight and dimensional limitations imposed by in-transit states or authorized by special permits obtained for transportation of the shipment. Contractor shall be responsible for all fines, penalties and claims resulting from failure to comply with this obligation.

(14)   With respect to fuel purchases set forth in Subparagraph 3 above, Contractor recognizes that Carrier is required by IFTA to file taxes governing fuel taxes for its services and accordingly agrees to purchase sufficient fuel within each state in which its equipment operates to assure payment of fuel taxes.  Contractor agrees to provide Carrier with satisfactory proof of such purchases and to pay any applicable deficiency.

(15)   With respect to base plates, if purchased in the name of Carrier, upon termination of the lease Carrier will transfer the plates to another unit if possible, crediting Contractor with any refund or credit it received.  If Carrier is unable to transfer the plates to another unit, then no refund or credit will be due to Contractor.

(16)   Detention time.

K.     <u>Payment</u>.  In accordance with 49 C.F.R. 376.12(f) Carrier agrees to pay Contractor within 15 days after submission of necessary delivery documents to secure payment from shipper and driver log books required by the U.S. DOT.  Because the parties recognize that the U.S. DOT regulations now require the Carrier to maintain supporting documents including but not limited to trip reports, weight tickets, evidence of toll receipts and fees, as well as other documents, Contractor agrees to submit these additional documents with its settlement.  If such documentation is not provided within 5 working days of Carrier's request, Contractor agrees to a settlement deduction of $50 per occurrence to reimburse Carrier for the administrative expense of re-requesting the documentation.  I

L.     <u>Chargeback Options</u>.  Carrier shall be entitled to chargeback to Contractor and deduct from settlement the following: (1) all payments paid by Carrier for authorized advances and costs incurred by Carrier on behalf of Contractor as a result of Contractor's obligations enumerated in J above.  In addition, any advance specifically confirmed in writing, the purchase of any goods or services from Carrier by Contractor as specifically authorized in this Agreement or otherwise and specifically enumerated fine or penalty may be deducted for the

Initial Here: BM

specific amount provided for herein or at Carrier's cost without markup. Contractor will be afforded copies of documents necessary to determine the validity of any charge.

        M.    <u>Products, Equipment or Services from Carrier</u>. Contractor is not required to purchase or rent any products, equipment or services from Carrier as a condition of entering this Lease. Any product, equipment or service which Contractor elects to purchase shall be enumerated in Appendix D or by subsequent addenda.

        N.    <u>Insurance</u>. Carrier has a legal obligation under federal statute to provide bodily injury and property damage insurance to the public for the use of the leased equipment pursuant to 49 U.S.C. 13906 during the term of this Lease. Contractor agrees to carry non-trucking liability (so-called "deadhead and bobtail") insurance with a combined single limit of not less than $500,000 and will provide proof of such coverage to Carrier during the term of this Agreement. Contractor further agrees that it is its sole duty to require and maintain at its expense worker's compensation insurance or other insurance required by the provision of any applicable employer's liability law on all drivers and any other employees required by Contractor or hired by Contractor to perform the services under this Agreement. A certificate of worker's compensation will be furnished upon request. If Contractor elects to obtain and if Contractor maintains that worker's compensation is not required due to statutory exemption, it will provide evidence of comparable occupational accident insurance and otherwise warrants that it will indemnify and hold harmless Carrier against any allegation of cut-through liability.

        If Contractor elects to purchase any insurances from sources available through Carrier, such coverage will be set forth in Appendix D and Carrier will provide Contractor with a copy of each policy upon request, providing to Contractor a certificate of insurance naming the insurer, the policy number, the effective dates, the amount of coverage, the cost to lessor and any deductible.

        O.    <u>Cargo and Accident Deductible</u>. Notwithstanding any public liability insurance or cargo insurance maintained by Carrier, Contractor agrees to pay to Carrier an amount equal to the first $2500 of the expense incurred by Carrier and paid to it any cargo claimant or accident victim as a result of the negligence of Contractor or its employees in the performance of this contract. Prior to any such deductions, Carrier shall provide to Contractor with a written explanation and itemization of any deductions for cargo or property damage made from any compensation of money owed to Contractor.

        P.    <u>Notification Requirement</u>. Contractor further agrees to immediately notify Carrier of any potential cargo claim, accident, fine, citation or out-of-service order incurred by Contractor or its employees in order to ensure Carrier's compliance with its customer and safety obligations.

        If for any reason Contractor fails to return Carrier's equipment or remove placards within 24 hours of termination, Contractor acknowledges that Carrier may seek a writ of replevin and agrees to pay all attendant attorney's fees and costs as well as the cost of recovery incurred by Carrier in recovering its equipment and removing its placards.

Initial Here: BM

Q.    Escrow of Funds. The Contractor shall deposit with the Carrier a performance bond issued by a Surety Company approved by Carrier in the amount of $2,500.00 per vehicle, or at his option, may furnish in lieu thereof a $500.00 cash bond to guarantee the full, complete and competent performance of the Contractor's obligations under this contract. These obligations include the settlement of all accounts between Contractor, its employees or agents, and Carrier, reimbursement of authorized chargeback items, and the return of all regulatory agency permits, tags and identifications issued in the name of the Carrier and the Contractor upon expiration or termination of the Contract or upon the execution of a receipt for the equipment.

The Contractor shall receive notice through the settlement process of any transaction involving the escrow funds, to include any withdrawals or any other adjustments to the escrow account. Contractor shall have the right to an accounting for transactions involving the escrow fund at any time. The Carrier shall compute interest on the escrow funds at least quarterly. For purposes of calculating the balance of the escrow fund on which interest must be paid, the Carrier may deduct a sum equal to the average advance made to the Contractor during the period of time for which the interest is to be paid. The interest rate that is to be applicable to said interest payments shall be set at a rate equal to the average yield or equivalent coupon issue yield on 13-week Treasury Bills as established in the weekly auction by the Department of Treasury at the beginning of each period for which interest is to be calculated.

If for any reason Contractor fails to return Carrier's equipment or remove placards within 24 hours of request, Contractor acknowledges that Carrier may seek a writ of replevin and agrees to pay all attendant attorney's fees and court costs as well as the cost of recovery incurred by Carrier in recovering its equipment and removing its placards.

Carrier shall return any remaining escrow funds to Contractor no later than 45 days from the date of termination.

R.    Impermissive Use of Equipment. The parties contemplate that Contractor may use trailer equipment owned by Carrier to provide the contracted services. Such equipment may be used without additional charge for the purpose of providing services for Carrier or with Carrier's express permission. During the term of this Agreement, if Contractor moves or pulls Carrier's trailer from Carrier's terminal or other location without Carrier's authorization, Contractor will be assessed 15¢ per mile for the total number of miles and all other charges incurred in securing and returning such trailer subject to a minimum charge of $50 per day.

2.    Contractor Independence/Control of Operations.

A.    Federal and State Laws. At all times, Independent Contractor shall remain solely responsible for payment of all federal and state taxes accruing as a result of its maintenance and use of the leased vehicle, retention and payment of driver personnel to perform services under this agreement. Contractor warrants that it is familiar with and shall comply with all applicable employment laws and applicable taxes including and not limited to federal and state income tax, state worker's compensation, unemployment compensation taxes, and overtime

Initial Here: BM

requirements which may be applicable.  Contractor shall indemnify and hold Carrier harmless from these obligations.

To the extent not inconsistent with federal, state and safety regulations, including but not limited to hours of service requirements, highway speed limits and other restrictions, Contractor shall be free to set the method and time of performance for all delivery of loads accepted by it. The parties agree and understand that federal and state laws and regulations impose duties on carriers including the maintaining of records of Contractor operations, equipment maintenance, hours of service, reporting for state tax purposes all miles run by the vehicle as well as additional obligations imposed by Carrier's insurer whose federal filings are a prerequisite of operations. Contractor agrees to comply with these federal duties and statutes with respect to the equipment leased to Carrier and will provide all necessary supporting documents as required by law. Contractor warrants that it will only permit driver personnel to perform service under this Contract who have been credentialed and approved by Carrier in accordance to US DOT requirements.

B.    Customer-Specific Requirements.  The parties agree that in the performance of this contract, Carrier in its sole discretion will tender Contractor individual loads, subject to its equipment availability on a load-by-load basis.  It is agreed that any load may have customer-imposed service requirements which will be conveyed to the Contractor at time of tender.  Contractor agrees to accept or reject the load tender and is not subject to forced dispatch. In accepting the load, Contractor agrees to perform in accordance with any special ground rules imposed by the customer and further warrants that the expected service can be provided in a safe and non-negligent fashion in accordance with its drivers' available hours of service.

C.    Routes and Methods.  The parties agree that federal regulation requires a Carrier to be responsible for accounting for all miles run by the involved commercial vehicle while under lease and for the hours of service of the driver operating the leased vehicle, regardless of whether the truck is under dispatch.  Notwithstanding these requirements, Contractor is free to select the routing for performing any dispatch consistent with state and federal highway speed limits, weight and other restrictions.  Carrier will assist Contractor by providing practical routing information for its use. Contractor agrees to indemnify and hold harmless Carrier from any claim, fine, loss or damage which arises from the "deadhead or bobtail" use by it of the equipment.

Contractor agrees to indemnify and hold harmless Contractor from any claim, fine or assessment arising out of its failure to comply with the warranties and representations contained in this paragraph.

D.    Independent Contractor Status.  It is the intent of the parties for Contractor to retain the status of an independent contractor in business for federal and state law purposes. Carrier's control over Contractor shall be limited to that control required by federal and state statutes and regulations governing the conduct of motor carriers.  Contractor shall train all of its driver personnel in accordance with U.S. DOT requirements and shall submit all driver personnel to Carrier for qualification, safety and training to the extent required by federal regulations. Neither Contractor nor its driver employees shall be required to attend other employment

Initial Here: BM

training meetings held by the company nor shall they be subject to the company employment manual. Contractor shall have the right to substitute other qualified drivers to perform the services subject to Carrier's confirmation that Contractor's driver meets the driver qualifications established by the U.S. DOT and its insurers.

Contractor warrants that no driver will be used until the driver has been qualified by Carrier in accordance with federal safety requirements. At all times, Contractor shall remain responsible for hiring and supervising his employees and for paying their salaries and all relevant taxes. Contractor warrants compliance with all federal and state employment laws and shall indemnify and hold Carrier harmless from its failure to discharge such obligations.

Contractor shall at all times be free to set its hours of operations consistent with the federally imposed hours of service requirements and the scope of the work accepted and the customer's service expectations. Contractor is free to work when and where it chooses and shall accept or reject work assignments on a load by load basis. Contractor agrees to comply with any scope of work requirement imposed by the customer service conditions when accepting a job assignment but is otherwise free to schedule the order of its work.

Where shipper requires same and to facilitate efficient dispatch, Contractor agrees to provide electronic notification of its operating status including when equipment is loaded, unloaded or otherwise available to dispatch. Otherwise no oral or written report other than the supporting documents and logs required by the DOT, bills of lading and shipping documents required by the customer for payments and fuel taxes as required by IFTA shall be required.

Contractor shall be solely responsible for furnishing the power equipment used to provide service and shall keep same in good repair in accordance with federal regulation and inspection requirements. Contractor shall be solely responsible for the payments on the leased equipment on the subject equipment and shall have the right to make all crucial decisions with respect to the maintenance and operation of such equipment.

Consistent with the leasing regulations which require Carrier to have exclusive possession and control of the equipment, Contractor shall be free with notice to work for other carriers or customers. When Contractor works for other carriers or customers, Contractor shall not operate under, or display, the placards or other identifying equipment of Carrier. Contractor shall have the right to discharge any driver it employs at any time. Contractor agrees that it shall reassign any driver which Carrier in its sole discretion determines is unqualified to comply with Carrier's federal imposed safety duties.

Contractor warrants as a condition of this contract that all equipment will be continually operated in accordance with U.S. DOT safety regulations in a non-negligent fashion.

Contractor shall accept work assignments on a job by job or load by load basis and agrees to comply with any ground rules or scope of work requirements established by the shipper as a service condition imposed on the work provided. Carrier does not guarantee Contractor a profit or limit its profit margin for contracts performed.

Initial Here: BM

3.     Standard Operating Procedures.  Because Carrier's customers require on-board communication to track delivery times, confirm pickups and deliveries and obtain advice about in-transit conditions, Contractor agrees to obtain on-board communication devices compatible with Carrier's system.  Such equipment may be obtained and installed by Contractor in leased unit at its choosing.  If purchased or leased from Carrier, Contractor's decision will be reflected in Appendix D and deduction from settlement will be authorized.

Unless Contractor or its driver notifies Carrier to the contrary, for the parties' mutual benefit, Carrier will tender loads to Contractor's driver using such on-board communications in real time based upon the availability of shipments, the equipment, and notice provided electronically that the leased equipment is available for a new contract consistent with the driver's available hours of service and its location.  To facilitate these standard operating procedures, Contractor agrees to afford Carrier reasonable notice if its driver or unit is otherwise unavailable to accept additional loads.

4.     Contractors, Warranties, and Indemnification. As consideration for entering into this agreement, Contractor warrants as follows:

   a.   that it is properly licensed and authorized to conduct its independent trade or business in accordance with local and state laws;

   b.   that it will comply with all federal, state, and local taxing authorities that are applicable to its trade or business and will pay all applicable withholding and employment taxes and insurance payments as they come due by reason of its retention of personnel to provide the contracted service;

   c.   that it will not accept or incur any payment obligation on behalf of Carrier without its express written approval; and

   d.   that it will promptly notify Carrier of any acts that result in any type of loss, shortage, citation, fine, or out of service order incurred in the course of its use or maintenance of the lease equipment during the period of this lease.

5.     Contractor agrees to indemnify and hold Carrier harmless from any breach of the above warranties or if other claim laws or damage arising out of the negligent or willful acts or omission of it, its officers, directors, employees, or agent

6.     Integrated Claim. The Parties agree that this contact sets forth the full understanding of the Parties and shall not be modified or changed in any way except by express written addendum.

7.     Termination. This Contract may be terminated by either party on fifteen (15) days written notice.  If, in the sole opinion of Carrier, the driver qualified by Contractor to provide services fails to comply with the Federal Motor Carrier Safety Regulations, Carrier may terminate this Agreement at any time.

Initial Here: BM

8.      Claims Notification. The Parties recognize in accordance with federal statute, Carrier has 6 months from the issuance of any freight invoice to file an undercharged claim with its Shipper. Accordingly, the Parties agree that Contractor will review its settlements and notify Carrier not later than 165 days after issuance of its disputed amount or thereafter will be barred.

9.      Alternative Dispute Resolution.  The parties agree that any dispute concerning the terms of this Agreement will be submitted to mediation followed by binding arbitration before a tribunal convened under the rules of the American Arbitration Association at Atlanta, GA.

10.     Venue and Jurisdiction. This agreement is made pursuant to the requirements of federal law and otherwise subject to the laws of the State of Georgia.  The parties agree that that any lawsuit shall be filed in a court of competent jurisdiction in Gwinnett County.

Dated this __12th__ day of __May__, 20__21__.

[CARRIER]:316 Towing and Road Service          [CONTRACTOR]:_____

_____                        _____
Signature                                        Signature

_Eli Kudrin_                                      _Brian Morris_
Print Name                                        Print Name

_Manager_                                         _____
Title                                             Title

Initial Here: _____

**Exhibit A., p. 010**

APPENDIX A

**IDENTIFICATION OF EQUIPMENT**

|  | Make | Year | Serial No. |
|---|---|---|---|
| Tractor | 2019 RAM 4500 | 2019 | |
| Trailer | | | |
| Trailer | | | |
| Trailer | | | |
| Trailer | | | |
| Trailer | | | |

Name of Contractor: _____

Phone: _____ Fax: _____

Address: _____

FID No. _____ or SSN: _____

I certify that the above named Contractor is the title holder or beneficial owner of the identified equipment authorized to receive payments for the use of this equipment pursuant to the terms of this Agreement.

_____
Signature

_____
Date

Initial Here: _____

## APPENDIX B

## **COMPENSATION**

For use of Contractor's:    Tractor:       \_\_\_\_\_% of adjusted gross revenue

                            Trailer:       \_\_\_\_\_% of adjusted gross revenue or

                                           \_\_\_\_\_¢ per mile loaded and

                                           \_\_\_\_\_¢ per mile empty

Initial Here: \_\_\_\_\_

**Exhibit A., p. 012**

APPENDIX C

## RECEIPT FOR EQUIPMENT

This Receipt is issued by Carrier to the beneficial owner _____
for VIN No. _____ this date for possession of the
equipment pursuant to an Independent Contractor Agreement.  This Receipt shall serve as
compliance with 49 C.F.R. ' 376.11 as evidence of a continuing 30 day lease for Carrier to
transport general commodities without exception.  A copy of the original Lease is kept by Carrier
at  796 Bill Rutledge Rd, Winder, GA 30680 ____ [address].

Received this _____ day of _____, 20_____ at _____ A.M. / P.M.

By: _____ (Authorized Agent of Carrier)

**RELEASE OF EQUIPMENT** (To be completed upon termination of agreement)

Independent Contractor hereby acknowledges receipt of Equipment described in this Agreement.

Hour _____ A.M. / P.M.  Date_____  Place_____

Independent Contractor Signature_____

Initial Here: _____

**Exhibit A., p. 013**

APPENDIX D

Equipment Owner_____

Tractor Number _____   Trailer Number _____

Jeep _____   Booster _____   Stinger _____

## I.  INITIAL START-UP COSTS TO BE PAID BY CONTRACTOR:

| | |
|---|---|
| Tractor Base Plate – Owner to furnish own base plate | ☐ Yes   ☐ No |
| CARRIER to furnish base plate at a charge of | $ _____ |
| Trailer Plate – Owner to furnish own trailer plate | ☐ Yes   ☐ No |
| CARRIER to furnish trailer plate at a charge of | $ _____ |
| Permit Package – 48 State | No Charge |
| Truck Escrow – In lieu of providing a Performance Bond as identified in the Independent Contractor Agreement, CONTRACTOR may post escrow money in the amount of | $ _____ |
| Owner to provide Surety Bond | ☐ Yes   ☐ No |
| Owner to escrow money | $ _____ |
| Initial Leasing Cost Total | $ _____ |

CONTRACTOR authorizes CARRIER to withhold from Contractor's weekly settlements in payments of $ _____ for ten (10) of the first eleven (11) settlements to pay the Initial Leasing Cost Total.

## II.  INSURANCE:

Insurance Charges – Owner will furnish required insurance at minimum levels as identified in the Independent Contractor Lease Agreement for:

| | |
|---|---|
| Occupational Accident | ☐ Yes   ☐ No |
| Bobtail | ☐ Yes   ☐ No |
| Physical Damage | ☐ Yes   ☐ No |

CARRIER will make available to CONTRACTOR insurance at the following:

| | |
|---|---|
| Occupational Accident | $_____ per week |
| Bobtail | $_____ per month |
| Physical Damage | $_____ per $1000 |

Initial Here: _____

**III.  BANK FEES:**

Electronic Financial Transaction Charges – The CARRIER utilizes ComData/Fleet One/EFS services for electronic financial transactions.  The following ComData/Fleet One/EFS fee schedule applies and will be deducted as incurred regardless of cost to Company:

| | |
|---|---|
| Service Fee for 1st time card use per day | $_____ |
| Service Fee for each card use per day after initial 1st time use | $_____ |
| ATM Withdrawal (U.S.) | $_____ |
| ATM Withdrawal (international Fee) | $_____ |
| ATM Balance Inquiry | $_____ |
| ATM Decline | $_____ |
| Transfer money to a bank account | $_____ |
| POS Debit Transactions | $_____ |
| Comcheck Draft | $_____ |
| Comdata Answer Plus Phone Service | $_____ per minute* |

* A per call charge of $_____ applies to all calls originating from a payphone.
See ComData informational sheet for additional information regarding ComData services.

**IV.  REIMBURSABLES TO CONTRACTOR**

Amount to be reimbursed on the first settlement for travel expense to orientation:

_____ X _____ = _____
Total Miles                  Travel Pay                     Total Reimbursement

Travel Pay will be paid at the rate of $_____ per mile for all miles up to 499 from drivers' place of residence to orientation location and at the rate of $_____ per mile for all miles 500 and greater from drivers' place of residence to orientation location.

**V.  MAINTENANCE RESERVE**

Maintenance Reserve Participation (circle one)                    Accept    Decline

A minimum of $_____ will be deducted from each settlement

2290 Reserve Participation (circle one)                                  Accept    Decline

A draw will be made until a maximum of $_____ has been escrowed towards payment of your 2290.

I have reviewed this schedule of initial leasing costs and other associated costs and agree to these deductions from my settlements.  I have received a complying certificate of insurance for any insurance which I elect to purchase through Company and understand that a copy of the policy/policies will be provided upon request.

Contractor: _____    Date: _____

Witness: _____    Date: _____

Initial Here: _____

**Exhibit A., p. 015**

## <u>ADDENDUM TO CONTRACTOR AGREEMENT</u>

The parties agree as follows:

(a)   Contractor is free to accept or reject assignments of any load from 316 Towing and Road Service

(b)   Contractor's remuneration is based upon trips or deliveries accomplished.

(c)   Services provided by Contractor will be performed utilizing the vehicle or vehicles leased by Contractor pursuant to the lease.

(d)   The written Lease to which this addendum is attached is in compliance with O.C.G.A. 34-8-35(n)(17).

(e)   Contractor warrants that it knows it is responsible to pay estimated Social Security taxes and federal and state income taxes.

    (i)   **Social Security tax Contractor must pay is higher than the Social Security tax an individual would pay if he or she were an employee.**

    (ii)   **The services or work provided by Contractor are not covered by unemployment compensation laws of Georgia.**

(f)   The written contract does not prohibit Contractor from pickup, transportation or delivery of property for more than one common carrier or any other person or entity when utilizing a motor vehicle agreement other than that leased hereunder.

Contractor Signature

Date: 5/12/2021

Initial Here: BM

**Exhibit A., p. 016**